IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| K.C. ex rel. HER PARENTS | : | CIVIL ACTION |
| | : | NO. 10-4323 |
| Plaintiffs, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| NAZARETH AREA SCHOOL | : | |
| DISTRICT, | : | |
| | : | |
| Defendant. | : | |


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                      August 26, 2011

TABLE OF CONTENTS

I.   INTRODUCTION...........................................3

II.  BACKGROUND.............................................4

     A.   Factual Background................................4

     B.   Procedural Background.............................5

III. LEGAL STANDARDS........................................7

     A.   The IDEA..........................................8

     B.   Challenging the Provision of a FAPE..............10

     C.   Disposition on the Administrative Record.........11

IV.  ANALYSIS..............................................13

     A.   Plaintiffs' Motion for Judgment on the Administrative
          Record...........................................13

          1.   Denial of FAPE..............................13

               a.   The Hearing Officer Did Not Abuse Her
                    Discretion in Relying on the

```
               Austill Report..........................14

        b.   The Hearing Officer Did Not Erroneously
             Equate Equine Therapy as Equivalent to PT
             Services................................18

        c.   No Denial of Necessary SOT Services.......22

        d.   No Denial of Necessary Executive
             Functioning..............................24

        e.   K.C.'s Transition Plan was Appropriately
             Individualized...........................30

             i.    Applicable Law......................31

             ii.   No Denial of Proper Travel Training...32

             iii.  K.C. Does Not Still Lack the Skills
                   Necessary to Meet her Transition
                   Goals...............................36

   2.   Delays Are Not the District's Fault............42

        a.   Delay of PT and OT is Due to the District..45

   3.   Zealous Advocacy...............................47

   4.   Attorneys' Fees................................52

B. Defendant's Motion for Judgment on the Administrative
   Record............................................52

   1.   Extraneous Arguments...........................52

        a.   The Hearing Officer Did not Commit an Error
             of Law...................................53

        b.   Any Claim for Compensatory Education for the
             2006-2007 School Year is Time Barred.......54

        c.   The District is Not Legally Obligated to Act
             as Student's LEA Beyond Age 21.............54

        d.   The District's Proposed IEP of November 2009
             Constituted a FAPE........................54

   2.   Defendant is Entitled to Judgment as to Counts I,
```

II, III, and IV................................55

V.   CONCLUSION.............................................58

## I. INTRODUCTION

Plaintiffs, K.C. and her Parents (collectively
"Plaintiffs"), initiated this action against Nazareth Area School
District ("Defendant" or "District").  Plaintiffs seek the
reversal of Pennsylvania Special Education Hearing Officer Anne
L. Carroll's ("Hearing Officer Carroll") decision insofar as she
denied Plaintiffs' request for full days of compensatory
education from the 2007-2008 school year through the time of the
filing of Plaintiffs' due process complaint.  On August 25, 2010,
Plaintiffs filed a complaint in this Court appealing Hearing
Officer Carroll's decision.  Plaintiffs maintain that Defendant
did not provide K.C. appropriate services thus resulting in the
denial of K.C.'s right to a free and appropriate public education
("FAPE") under the Individuals with Disabilities Education Act
("IDEA"), 20 U.S.C. § 1400, et seq.  Plaintiffs request
compensatory education and prevailing party fees under the IDEA,
Section 504 of the Rehabilitation Act of 1973, and the Americans
with Disabilities Act.[1]

---

[1]     Although Plaintiffs bring their claims under the IDEA,
the Rehabilitation Act, and the American with Disabilities Act,
the parties have stipulated that Plaintiffs will not claim and
will not be entitled to any remedy which they would not be
entitled to under the IDEA.  (See doc. no. 18.)

Before the Court are the parties' cross-motions for judgment on the administrative record or, in the alternative, summary judgment.  The Court will first discuss the relevant factual and procedural background.  Next, the Court will address the relevant law and applicable standard of review.  Finally, the Court will analyze Plaintiffs' and Defendant's motions for judgment on the administrative record or, in the alternative, summary judgment.

For the reasons set forth below, the Court will grant the Defendant's cross-motion, deny Plaintiffs' motion, and affirm Hearing Officer Carroll's decision.


## II.  BACKGROUND


A.   Factual Background

K.C. is a twenty-year-old resident of the District, and she has attended the Pathway School, an approved private school, at the District's expense, since 2006.  (H.O. Decision FF at ¶¶ 1, 3.)   K.C. has well-documented medical problems which have adversely affected her educational progress since her early school years.  K.C.'s  difficulties were attributed to brain damage arising from an in-utero stroke; however, in 2006, K.C. was diagnosed with a genetic disorder, Prader-Willi Syndrome. (Id. at ¶ 5.)  This genetic disorder is believed to be the

4

underlying cause for most, if not all, of the disabilities that adversely affect K.C.'s academic and functional skills.

B.   Procedural Background

In July 2009, Plaintiffs initiated a due process hearing against the District alleging that the District violated the IDEA by denying K.C. a FAPE.  Plaintiffs claim that, through the fault of the District, K.C. was denied various services that resulted in K.C.'s denial of a FAPE.  In particular, the services Plaintiffs state were denied include ninety-two hours of physical therapy ("PT"), eighty-four hours of sensory occupational therapy ("SOT"), and one hundred seventeen hours of executive functioning services.  Hearing Officer Carroll found that such services were not denied and K.C. was not denied a FAPE.  On August 25, 2010, Plaintiffs filed a complaint attacking various aspects of Hearing Officer Carroll's decision.  The following is a list of the portions of Hearing Officer Carroll's decision which Plaintiffs dispute in their complaint:

1.   The Hearing Officer reached an erroneous conclusion of fact in finding that any delay in providing services to K.C. was attributable to K.C.'s Parents.  (Compl. at ¶ 81(i).)

2.   The Hearing Officer abused her discretion in failing to

consider Parents' objection to the District's
contractor—Austill.  (<u>Id.</u> at ¶ 81(ii).)

3.  The Hearing Officer committed an error of law by
implementing an equitable requirement that Parents
agree to evaluations and proposed IEPs in the interest
of avoiding delays.  (<u>Id.</u> at ¶ 81(iii).)

4.  The Hearing Officer abused her discretion in
attributing delays to K.C.'s Parents.  (<u>Id.</u> at ¶
81(iv).)

5.  The Hearing Officer committed an error of law by
obligating Parents, during the pendency of due process
or otherwise, to "partial agreement" with a proposed
IEP that includes inappropriate services.  (<u>Id.</u> at ¶
81(v).)

6.  The Hearing Officer committed an error of law by
failing to recognize the District's ongoing obligation
to provide K.C. a FAPE which includes all related
services.  (<u>Id.</u> at ¶ 81(vi).)

7.  The Hearing Officer reached an erroneous finding of
fact in finding that K.C. had been offered services for
her executive functioning needs prior to April 2009.
(<u>Id.</u> at ¶ 81(vii).)

8.  The Hearing Officer reached an erroneous conclusion of
law when she found that the District's obligation to

proffer programming and services reasonably designed to
allow K.C. to reach her transition goals was met by
nonspecific generic programs.  (<u>Id.</u> at ¶ 81(viii).)

9.   The Hearing Officer reached an erroneous finding of
fact in finding that K.C. had been offered services
that addressed her PT needs because she was provided
equine equilibrium therapy. (<u>Id.</u> at ¶ 81(ix).)

10.  The Hearing Officer abused her discretion in finding
that the Parents were obligated to accept the November
2009 individualized education plan. (<u>Id.</u> at ¶ 81(x).)


On October 27, 2010, the District filed a motion to
dismiss which was denied.  Thereafter, the District filed an
answer, denying Plaintiffs' allegations and asserting numerous
defenses.  On February 7, 2011, Plaintiffs filed a motion for
judgment on the administrative record or, in the alterative,
summary judgment.  Thereafter, on March 9, 2011, the District
filed a cross-motion for judgment on the administrative record
or, in the alterative, summary judgment.  These motions, as well
as the responses and replies to said motions, are currently
before the Court.


## III. LEGAL STANDARDS

A.   The IDEA

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education."  20 U.S.C. § 1400(d)(1)(A).  A FAPE is "an educational instruction 'specially designed . . . to meet the unique needs of a child with a disability,' coupled with any additional 'related services' that are 'required to assist a child with a disability to benefit from [that instruction].'" Winkelman ex rel. Winkelman v. Parma City Sch. Dist., 550 U.S. 516 (2007) (citing 20 U.S.C. § 1401(29)); see also 20 U.S.C. §§ 1401(9),(26)(A).  A FAPE must be provided "under public supervision and direction, . . . meet the standards of the State educational agency, . . . [and] include an appropriate preschool, elementary school, or secondary school education in the State involved."  Winkelman, 550 U.S. at 524 (citing 20 U.S.C. § 1401(9)).  It must be provided at "no cost to parents."  Id. (citing 20 U.S.C. § 1401(29)).

To ensure that every qualifying child receives a FAPE, school districts must develop an Individualized Educational Plan ("IEP") that is tailored to the child.  Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 181 (1982).  "'An IEP consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable

for reaching the goals by way of the services.'" D.S. v. Bayonne
Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010) (quoting Holmes v.
Millcreek Twp. Sch. Dist., 205 F.3d 583, 589 (3d Cir. 2000)).
Compliance with the IDEA requires that a student's IEP be
"reasonably calculated to enable the child to receive educational
benefits." Rowley, 458 U.S. at 206-07.  An IEP will be deemed to
provide an appropriate education if it provides for "significant
learning" and confers a "meaningful benefit." Ridgewood Board of
Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 247 (3d Cir. 1999).
When determining whether a proposed IEP is reasonably calculated
to enable a child to receive educational benefits, a court must
determine the appropriateness of an IEP as of the time it was
made. Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 762 (3d Cir.
1995).

        Although a school district is required to provide a
FAPE to all disabled children, 20 U.S.C. § 1412, it is not
required to provide the best possible education to maximize
educational benefits. Rowley, 458 U.S. at 197 n.21; Polk v.
Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 178 (3d
Cir. 1988).  Moreover, while parents play a role in the
development of an IEP, parents do not have a right to compel a
school district to provide a specific program or employ a
specific methodology in educating a student. See Rowley, 458
U.S. at 199 (stating that a FAPE does not require "the furnishing

9

of every special service necessary to maximize each handicapped
child's potential"). Nor is a school district required to
provide each disabled child an equal educational opportunity
commensurate with the opportunities provided to other children.
Id. at 198; cf. Ridgewood, 172 F.3d at 247 (stating that the IDEA
requires no more than a "meaningful benefit," which "must be
gauged in relation to the child's potential." (quoting Polk, 853
F.2d at 185)).


    B.   Challenging the Provision of a FAPE

       The IDEA provides for administrative and judicial
review as to whether a child is receiving a FAPE. See 20 U.S.C.
§ 1415(f)-(i). In Pennsylvania, if parents disagree with the
school district's provision of a FAPE, they may request an
impartial due process hearing conducted by a hearing officer.
Id. § 14.162(b). A party aggrieved by the hearing officer's
decision may appeal to a court of competent jurisdiction. Id. §
14.162(o). The party seeking relief bears the burden of proving
the appropriateness or inappropriateness of the education. L.E.
v. Ramsey Bd. of Educ., 435 F.3d 384, 391 (3d Cir. 2006)

       On appeal, the IDEA permits a court to "grant such
relief as the court determines is appropriate." 20 U.S.C. §
1415(i)(2)(C)(iii). The Act is silent, however, as to what type
of relief is "appropriate." In addressing what is "appropriate"

relief under the IDEA, the Supreme Court concluded that the "only possible interpretation [of section 1415(i)(2)(C)(iii)] is that the relief is to be 'appropriate' in light of the purposes of the act." Sch. Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 369 (1985).  One form of relief granted by courts is compensatory education.  Compensatory education, however, is not defined within the IDEA because it is a judicially created remedy. Ferren C. v. Sch. Dist. of Philadelphia, 612 F.3d 712, 717 (3d Cir. 2010).  It is intended as "'a remedy to compensate [the student] for rights the district already denied . . . because the School District violated [the] statutory rights while [the student] was still entitled to them.'" Id. (quoting Lester H. by Octavia P. v. Gilhool, 916 F.2d 865, 872 (3d Cir. 1990)).


    C.   Disposition on the Administrative Record

        When an aggrieved party initiates a civil action in a federal district court, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(B). The court exercises plenary review over the Hearing Officers' legal conclusions. J.D.G. v. Colonial Sch. Dist., 748 F. Supp. 2d 362, 372 (D. Del. 2010) (citing Carlisle Area Sch. Dist. v.

Scott P. ex rel. Bess P., 62 F.3d 520, 528 n.3 (3d Cir. 1995)).
However, as to factual findings, the court "applies a modified
version of de novo review and is required to give due weight to
the factual findings of the [hearing officer]." Ramsey Bd. of
Educ., 435 F.3d at 389.  Specifically, "due weight" requires that

> [f]actual findings from the administrative
> proceedings are to be considered prima facie
> correct.  If a reviewing court fails to
> adhere to them, it is obliged to explain why.
> The court is not, however, to substitute its
> own notions of sound educational policy for
> those of local school authorities.

S.H. v. State-Operated Sch. Dist. of City of Newark, 336 F.3d
260, 270 (3d Cir. 2003)(alternation and quotation omitted).  The
court is "required to defer to the [Hearing Officer's] factual
findings unless it can point to contrary nontestimonial extrinsic
evidence on the record."  Id. (citing Carlisle, 62 F.3d at 529).
The court "must explain why it does not accept the [Hearing
Officer's] findings of fact to avoid the impression that it is
substituting its own notions of sound educational policy for
those of the agency it reviews."  Id. (citations omitted); see
also Travis G. v. New Hope-Solebury Sch. Dist., 544 F. Supp. 2d
435, 441 (E.D. Pa. 2008) ("The Court is not . . . to substitute
its own notions of sound educational policy for those of local
school authorities.") (citations omitted); L.R. v. Manheim Twp.
Sch. Dist., 540 F. Supp. 2d 603, 614 (E.D. Pa. 2008) (same).

**IV. ANALYSIS**

    A.   <u>Plaintiffs' Motion for Judgment on the Administrative Record</u>

Initially, Plaintiffs' complaint attacked almost every aspect of Hearing Officer Carroll's decision; however, their motion for judgement on the administrative record refines these allegations.  First, Plaintiffs argue that K.C. was denied a FAPE from 2007 to 2009 because she was not provided appropriate services.  In particular, Plaintiffs claim that K.C. was not provided appropriate transition services because K.C. was not provided necessary PT, SOT, executive functioning therapy, or an individualized transition program.  Second, Plaintiffs argue that the Hearing Officer erred in finding that delays regarding the provision of these and other services was the fault of K.C.'s Parents.  Third, Plaintiffs argue that their "zealous advocacy" is not a legitimate basis for the denial of compensatory education.  Finally, Plaintiffs argue that they are entitled to attorneys' fees.

A review of the parties' lengthy briefing and the robust administrative record establishes that the Plaintiffs' arguments do not carry the day; therefore, Hearing Officer Carroll's decision will be affirmed.

    1.   <u>Denial of FAPE</u>

13

Plaintiffs' first argument is that K.C.'s IEP denied K.C. a FAPE because it did not include necessary transition services. (Hearing Trans. at 9-10; Pl. Mot. Summ. J. at 17.) In particular, Plaintiffs argue that K.C. was not provided ninety-two hours of PT services, eighty-four hours of SOT services, one hundred seventeen hours of executive functioning services, and an appropriate transition plan. The Court must determine whether Hearing Officer Carroll erred in finding that K.C. was not denied any of the aforementioned services, and even if she was denied a particular service, such denial did not result in the deprivation of a FAPE.

 a. <u>The Hearing Officer Did Not Abuse Her Discretion in Relying on the Austill Report</u>

Plaintiffs argue that the termination of K.C.'s PT services, in September 2007, resulted in the denial of ninety-two hours of direct PT services to which K.C. was entitled. (Pl. Mot. Summ. J. at 17.) Plaintiffs point to an evaluation done in January 2008, by Cindy Miles and Associates (the "Miles Report"), to support their position that K.C. was in need of direct PT services during the 2007-2008 school year, and the failure to provide such services resulted in the denial of a FAPE. Hearing Officer Carroll's findings of fact indicate that instead of crediting the Miles Report, she credited the District's reliance on a report done by Austill's Rehabilitation Services (the

14

"Austill Report").  Hearing Officer Carroll adopted, as fact, the
results of the Austill Report.  (H.O. Decision FF at ¶ 25.)
Plaintiffs argue that such a finding results in an abuse of
discretion because Hearing Officer Carroll did not properly
consider Plaintiffs' objections to the Austill Report.

As to this issue, the Court is faced with a finding of
fact, and the Court must review Hearing Officer Carroll's finding
via modified de novo review.  Additionally, the Court is mindful
that when dealing with credibility determinations, courts
generally rely on the hearing officer's determination given that
he or she observed all of the witness' live testimonies.  Shore
Reg'l High School Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d
194, 199 (3d Cir. 2004).  A hearing officer's finding of
credibility should only be disregarded if there is nontestimonial
evidence of record that would justify a contrary finding.  Id.

In September 2007, the District terminated K.C.'s PT
services based on two different physical therapy evaluations.
(D-32; P-1 at 6.)  The first report was prepared by Austill's
Rehabilitation Services.  (D-32.)  The second report was prepared
by Richard Kropp, Masters of Science in Physical Therapy of the
Colonial Intermediate Unit #20 (the "Kropp Report").  (P-1 at 6.)
Both these reports recommended that K.C. receive PT on a
consultative basis.

When presented with the Austill Report, Parents told

15

the District that the Report was "clearly mislabeled with the wrong student's name, or fraudulent." (Pl. Mot. for Summ. J. at 13.)  Parents also requested that K.C. be reviewed by an independent evaluator, at the District's expense.  In particular, Parents requested Cindy Miles perform the evaluation.  On January 2008, K.C.'s Parents received a report from Cindy Miles and Associates.  Plaintiffs claim that the Miles Report confirmed that the Austill and Kropp Reports were inaccurate because the Miles Report indicated that K.C. was still in need of direct school-based PT services.  (Id. at 19; P-45 at 3.)

Plaintiffs argue that the District erred in relying on the Austill Report because it was allegedly fraudulent. Plaintiffs also argue that reliance on the Austill and Kropp Reports was inappropriate because they were contrary to the Miles Report.  (Hearing Trans. at 68, 199-204.)  As a result of reliance on these allegedly erroneous reports, Plaintiffs conclude that K.C. was denied PT services to which she was entitled.

During the hearing, Plaintiffs attempted to establish that the Austill and Kropp Reports were fraudulent and/or inappropriate via the testimony of K.C.'s father.  As to the Reports being fraudulent, K.C.'s father testified in regards to the Austill Report.  K.C.'s father stated that the Report is fraudulent because the date on the report is wrong.

16

Additionally, K.C.'s father testified that two statements
contained in the report are false: (1) K.C. has age-appropriate
motor skills, and (2) K.C. can do sit-ups.  (Id.)  As to
Plaintiffs' argument that reliance on the Austill and Kropp
Reports was inappropriate because they are contrary to the Miles
Report, Plaintiffs again only offered the testimony of K.C.'s
father.  K.C.'s father testified that he believes the District
was obligated to provide PT based upon the Miles Report and that
the District termed the Miles Report as a "medical model" so it
could evade its obligation to provide services.  (Id. at 156.)

          In response to K.C.'s father's testimony that the
Austill Report was fraudulent, the District pointed out that this
Report was corroborated by the Kropp Report.  As to the issue of
whether the District inappropriately labeled the Miles Report as
being done via the medical model, the District provided the
testimony of Rosemary Mentesana ("Ms. Mentesana"), Director of
Pupil Services, who holds an educational specialist degree in
school psychology.  Ms. Mentesana stated that the Austill and
Kropp Reports were based on an educational evaluation model.
(Id. at 855.)  The Miles Report, on the other hand, was based on
a medical model.  (Id. at 857.)  Ms. Mentesana testified that she
confirmed that the Miles Report was, in fact, based on the
medical model by calling the office of Cindy Miles and Associates
and asking whether the evaluation was done based on the medical

17

model.  (Id.)  In response, she stated that she was told it was based on the medical model.  (Id.)  With respect to the particular circumstances of K.C., Ms. Mentesana testified: "I would rely more heavily on the educational model."  (Id. at 856.)

Based on this testimony and these Reports, Hearing Officer Carroll was tasked with determining whether the Miles Report should be credited over the Austill Report.  The Hearing Officer justifiably declined to credit K.C.'s father's testimony that the Austill Report was fraudulent because the Report's recommendation was corroborated by the Kropp Report.  As to the issue of whether the Miles Report was truly based on the medical model, the Court will not second guess the Hearing Officer's decision to credit Ms. Mentesana's testimony over K.C.'s father because Plaintiffs have not provided nontestimonial extrinsic evidence to the contrary.  Parents did not provide expert testimony from a licensed physical therapist to support their belief that the Miles Report was appropriate and the Austill Report was inappropriate.  The only evidence Parents provided was the testimony of K.C.'s father.  Hearing Officer Carroll's determination to rely on the Austill Report is well-supported by the evidence.  As such, the Court finds that the Hearing Officer did not abuse her discretion.

b.  The Hearing Officer Did Not Erroneously Equated Equine Therapy as Equivalent to PT

Services

Hearing Officer Carroll held that the fact that direct PT services were discontinued for some time did not result in any detriment to K.C. because the Equilibrium Equine Program ("equine therapy") adequately addressed K.C.'s PT needs. (H.O. Decision at 20; Id. FF at ¶ 7.) Hearing Officer Carroll stated that "[t]estimony from both Parents and their expert witness described Student's ability to accomplish motor tasks that she had not mastered with years of direct physical therapy." (H.O. Decision at 20.) Hearing Officer Carroll also noted that "Parents produced no evidence of a detriment to Student from the interruption of direct physical therapy." (Id.)

Plaintiffs argue that Hearing Officer Carroll erroneously found that the provision of equine therapy was the equivalent of PT services and that this finding has no basis in fact. (Pl. Mot. Summ. J. at 20.) In particular, Plaintiffs argue that K.C. did not receive appropriate PT support from equine therapy. (Id. at 21.) Plaintiffs state that this lack of necessary PT support is established by the Miles Report which indicates that, as of January 2008, K.C. had not met any of her goals. As such, Plaintiffs argue that the District's provision of equine therapy was not sufficient to fulfill K.C.'s PT needs. (Id.)

Plaintiffs are mischaracterizing Hearing Officer

Carroll's decision.  Nowhere in the decision does Hearing Officer
Carroll state that equine therapy was a substitute for direct PT
or any service necessary to meet an educational need.  Rather,
Hearing Officer Carroll states that all K.C.'s PT needs were met
through equine therapy.  As discussed above, Hearing Officer
Carroll credited the Austill Report and found, as a matter of
fact, that K.C. did not need direct PT to function successfully
in the school environment.  (H.O. Decision FF at ¶ 25.)
Moreover, according to the Austill and Kropp Reports, K.C. only
needed PT on a consultative basis.  Hearing Officer Carroll's
decision that equine therapy provided all necessary PT to achieve
this recommendation is well-supported by the record.

          At the hearing, Parents' neuropsychologist, Dr. Barbara
Gazze ("Dr. Gazze") testified.  Dr. Gazze stated that equine
therapy improves physical status and mobility through horseback
riding.  (Hearing Trans. at 974.)  Additionally, Dr. Gazze
indicated that K.C.'s Parents reported that K.C. improved
immensely from this therapy.  (Id. at 974-79.)  Moreover, Dr.
Gazze stated that equine therapy has improved K.C.'s physical
status and mobility which has lead to improvements in K.C.'s
balance and gross motor skills.  (Id.)  For example, K.C. is now
able to ride a bike and tie her shoes which indicates a
significant improvement in fine motor skills. (Id. at 974; D-110
at 58.)  K.C.'s father also testified that equine therapy is

beneficial and discussed K.C.'s monumental balance improvements since beginning equine therapy.  (Id. at 354:12-25.) Additionally, the District provided a letter from K.C.'s equine therapy instructor which indicates that equine therapy has resulted in "significant improvement in [K.C.'s] balance, coordination, self-esteem, and ability to take direct instruction in a positive matter."  (D-150.)

The aforementioned establishes that K.C. was, indeed, provided proper PT services for her needs.  Plaintiffs' reliance on the Miles Report to discredit this finding is misplaced.  As discussed above, the Miles Report is based on a medical model and only speaks to K.C.'s medical needs.  Districts are not required to develop and implement IEP's which provide medically rehabilitative services.  See Pardini v. Alleghany Intermediate Unit, 420 F.3d 181 (3d Cir. 2005) (recognizing that an IEP is based on an educational model); P.P. ex rel. Michael P. v. West Chester Area Sch. Dist., 585 F.3d 727, 739 (3d Cir. 2009) (stating that evaluations and resultant IEPs must be reasonably calculated to provide a meaningful educational benefit); Polk, 853 F.2d at 176 (stating that the role of PT in educational programming is to facilitate classroom learning).

Consequently, the Court finds that the District's provision of equine therapy provided K.C. adequate PT, and the District fulfilled its duty to provide a FAPE.

c.   <u>No Denial of Necessary SOT Services</u>

Plaintiffs argue that K.C. was denied eighty-four hours of necessary SOT services and is entitled to compensatory education for the loss of these services.   (Pl. Mot. Summ. J. at 21.)   In particular, Plaintiffs argue that the Hearing Officer's determination that the services provided at Pathway addressed K.C.'s sensory needs is unsupported in fact or evidence because this finding is based solely on the testimony of District Witness, Pathway's certified occupational therapist, Mandy Adamson ("Ms. Adamson").   (<u>Id.</u> at 23.)

Parents argue that K.C. was in need of SOT services delivered through a sensory integration approach.   However, at the hearing, Ms. Adamson, K.C.'s occupational therapist, stated that SOT delivered through a sensory integration approach was not appropriate for K.C. because of her age.   (Hearing Trans. at 1472-73.)   Ms. Adamson indicated that SOT delivered through a sensory integration approach occurs when the brain integrates information in the environment and this process typically occurs between the ages of four and eight.   (<u>Id.</u> at 1471.)   She went on to state that the types of sensory therapies appropriate for K.C. are sensory process, sensory modulation, and sensory strategy therapy.   (<u>Id.</u> at 1472.)   Ms. Adamson stated that the sensory strategy method of therapy is used by the Pathway School.   (<u>Id.</u>)

Ms. Adamson explained that K.C. has group and individual occupational therapy at Pathway. (Id. at 1452.) The group therapy involves a forty-five minute physical education class with Ms. Adamson and a physical education teacher. (Id.) This therapy uses many pieces of gym equipment to aid in the development of motor planning. (Id. at 1453.) The group therapy also involves a walking group which provides students an opportunity to discuss issues with Ms. Adamson and resolve conflict situations. (Id. at 1454.) Additionally, individual occupational therapy sessions are provided once a week. (Id. at 1457.) During these sessions, K.C. and Ms. Adamson work in the occupational therapy gym where they work on balance, balance awareness, strengthening, endurance, tolerance, and safety in the environment. (Id. at 1457-58.) Ms. Adamson stated that all the recommendations of the Miles Report are implemented in Pathway's occupational therapy program including motor planning, postural stability, postural control, body awareness, gravitational concerns, and sensory modulation. (Id. at 1460; P-45 at 11.) Furthermore, Ms. Adamson stated that K.C. has made progress which is evidenced by the complete absence of K.C. seeking out external sensory stimulation thus improving her ability to focus during classroom instruction. (Hearing Trans. at 1473-74.)

Although it was Plaintiffs' burden to establish the inappropriateness of K.C.'s education, at the hearing, Plaintiffs

failed to provide testimony from an occupational therapist or any
other specialist that would call Ms. Adamson's testimony into
question.  Hearing Officer Carroll found Ms. Adamson credible,
and Plaintiffs have not presented evidence to challenge this
credibility determination.[2]  This testimony establishes that K.C.
was provided sufficient SOT services through the programming
provided by the Pathway school and this resulted in a meaningful
benefit.

      d.   No Denial of Necessary Executive Functioning

      Plaintiffs argue that K.C.'s need for executive

---

[2]     The only evidence Plaintiffs cite to support the
proposition that K.C. was entitled to SOT services through a
sensory integration approach is the Miles Report and a 2005 IEP.
(Pl.'s Resp. at 26.)  Even assuming that these documents indicate
that such a service was recommended, Plaintiffs have failed to
establish that the SOT services provided did not confer a
meaningful educational benefit.  See Mary T. v. Sch. Dist. of
Philadelphia, 575 F.3d 235, 249 (3d Cir. 2009) ("We have held
that a plaintiff is entitled to compensatory education under IDEA
when 'an IEP fails to confer some (i.e., more than de minimis )
educational benefit to a student.'").  To establish that K.C. did
not receive a significant benefit from the SOT services provided
by the District, Plaintiffs cite to the goals listed in K.C.'s
proposed May 2007 IEP and May 2008 IEP.  Plaintiffs state that
these two documents have the same goals thus indicating that K.C.
"made no progress on her traditional OT goals from September 2007
onward." (Pl.'s Resp. 17.)  This assertion mischaracterizes the
IEPs.  Although the goals are the same between 2007 and 2008, the
IEPs indicate that K.C. made progress in achieving these goals
with the services she received between 2007 and 2008.  K.C.'s
goal of developing her organizational skills increased by five
percent (P-24b at 16; P-28 at 17), and K.C.'s goal of accepting
responsibility for her actions increased by ten percent.  (P-24b
at 17; P-28 at 18.)  A close evaluation of the IEPs indicates
that K.C. did, indeed, make improvements.

function coaching was established in August 2007, but the
necessary services were not provided until April 2009.  (Pl. Mot.
Summ. J. at 21.)  As a result, Plaintiffs state that they are
entitled to compensatory education for one hundred seventeen
hours of denied executive function coaching.  (Id. at 27.)
Contrary to Plaintiffs' argument, Hearing Officer Carroll found
that Plaintiffs are not entitled to compensatory education on
this basis because all necessary services were provided.

Hearing Officer Carroll found that in July and August
2007, evaluations indicated that K.C. should receive thirty
minute weekly sessions of individual counseling to develop coping
strategies, interpersonal problem-solving, perspective-taking,
and self-monitoring skills.  (H.O. Decision FF at ¶ 9.)  Starting
in the beginning of the 2007-2008 school year, these services
were provided.  (Id. at ¶ 10.)  Thereafter, in March 2009, it was
determined that these individual counseling sessions should be
increased to sixty minutes and this was done.  (Id. at ¶ 11.)
This increase occurred because the focus of the counseling
sessions shifted to emphasizing K.C.'s needs for organization,
planning, goal-setting and decision-making.  (Id.)  Hearing
Officer Carroll found that there was substantial overlap between
the skills addressed in the earlier thirty minute counseling
sessions and those prescribed to start after the March 2009
assessment.  (Id.)  An examination of the record indicates that

such findings are well-supported.

On May 20, 2007, an IEP was developed which included notes from Parents' neuropsychologist, Dr. Gazze.  These notes indicated that K.C. evidences deficits in her executive functioning which impacts her ability to plan and organize, set goals, or monitor progress.  (D-110 at 60.)  Dr. Gazze stated that these are areas of functioning "that need to be addressed through individualized instruction that focuses on the development of learning strategies and study skills, as well as personal self help skills."  (Id.)  Moreover, Dr. Gazze recommended that K.C. be placed in a small, quiet, non-competitive environment with continuous one-on-one assistance.  (Id. at 59-60.)  Plaintiffs' arguments stem from the fact that they read these notes to mean that K.C.'s executive functioning needs could only be fulfilled via one-on-one executive function coaching.  The record, however, indicates that Dr. Gazze's recommendations were fulfilled through different means.

Rather than providing one-on-one formal executive function coaching, the District fulfilled Dr. Gazze's recommendations via K.C.'s programming at the Pathway School for the 2007-2008 school year and portions of the 2008-2009 school year.  (Hearing Trans. at 543, 808; H.O. Decision FF at ¶¶ 9-10.) In fact, Dr. Killar, K.C.'s Parents' expert and K.C.'s executive function coach, testified that the Pathway School has a highly

26

structured routine which is very predictable and a good match for students with executive functioning difficulties.  (Hearing Trans. at 1167.)  This programming includes items such as teaching skills, practicing skills, and reviewing processes which are addressed all day.  Explicit organization strategies are structured into the school day including prompts, assignment planners, lists, checklists, and classroom bins.  Additionally, assignments are broken down into manageable steps, graphic organizers are used, and visual reminders of useful strategies are posted in the classroom.  One-to-one assistance occurs through the teacher and the teacher's assistant in every classroom.  (Id. at 1344-1348.)

        In addition to the executive function instruction embedded in the classroom, during the 2007-2008 school year, K.C. received weekly thirty minute individual counseling sessions with Dr. Killar.  (Id. at 1100-1101; D-41 at 7.)  These sessions focused on the development of interpersonal problem solving skills, perspective taking, self-monitoring, use of coping strategies, and self-awareness.  (Hearing Trans. at 1105.)  According to Dr. Killar, these counseling sessions overlapped with K.C.'s executive function instruction by addressing K.C.'s deductibility and emotional and behavioral control, decision making skills in the context of social interaction, and goal setting, all of which are executive functioning skills.  (Id. at

1105, 1109, 1166.)

Testimony established that through these sessions, K.C. made progress and has become more tolerant and independent in using coping strategies.  (Id. at 1100.)  Dr. Killar testified that she saw progress in K.C.'s flexibility, confidence, self-esteem, communication with peers, and emotional modulation.  (Id. at 1158-1160.)  Additionally, Parents informed Dr. Killar that they were pleased with these counseling sessions and saw improvement regarding K.C.'s flexibility in receiving feedback and conversations.  (Id.)

In April 2009, K.C. began receiving formal individual executive function counseling for one hour a week.  This counseling was, and is currently, received as a contracted service paid for by the District.  (Id. at 235, 589, 807-808.) This formal executive function counseling addresses K.C.'s inhibition, shift (mental flexibility), emotional control, working memory, ability to plan and organize, and ability to organize her environment and monitor her behavior.  (Id. at 1135-1146.)  This counseling takes place in the community, i.e., at Home Depot.  (Id. at 1170.)  Due to the community based instruction involved in this counseling, Dr. Killar recommended that these sessions be increased to ninety minutes during the 2009-2010 school year.  (Id. at 1129.)  The District agreed to Dr. Killar's recommendation and offered this service via the

September 15, 2009 IEP revised on November 6, 2009.  (<u>Id.</u> at 712.)

As to the benefits of these different executive function services, K.C.'s Parents admitted that K.C.'s executive functioning improved.  (<u>Id.</u> at 402.)  Additionally, Dr. Gazze testified that the executive function counseling provided by Dr. Killar is appropriate programming to address K.C.'s needs.  (<u>Id.</u> at 1042.)  Finally, as mentioned above, Dr. Killar testified as to the progress K.C. has made.  (<u>Id.</u> at 1178-1179, 1205-1207.)

The only evidence Plaintiffs point to in order to establish that the executive functioning was inappropriate is the fact that the September 2009 IEP states that K.C. continues to exhibit deficits in time management, planning, and prioritization.  This, however, is not surprising given that, as Dr. Gazze stated, executive functioning reaches things that are not automatically cured.  Rather, executive functioning requires the creation of a framework to help the student function.  (<u>Id.</u> at 984-985.)  Further, Plaintiffs' disagreement as to the form of executive function coaching that was provided is not enough to render the services inappropriate.  <u>See</u> <u>Rowley</u>, 458 U.S. at 199 (stating that a free appropriate public education does not require "the furnishing of every special service necessary to maximize each handicapped child's potential.").

Accordingly, the record clearly establishes that K.C.

29

received appropriate executive function coaching for her particular needs even though it was not provided in the form Plaintiffs would have preferred.  Moreover, the testimony of K.C.'s Parents, Dr. Gazze, and Dr. Killar establish that, prior to and after formal executive function counseling began, K.C. received a meaningful educational benefit from the executive function coaching provided by the District.  Consequently, compensatory education is inappropriate, and Hearing Officer Carroll's decision will be affirmed as to this issue.

e.   K.C.'s Transition Plan was Appropriately Individualized

Plaintiffs argue that K.C.'s transition plan was generic and inadequate to provide for K.C.'s individualized needs.  Plaintiffs argue that this denial of individualized transition services resulted in the denial of a FAPE and is a proper basis for an award of compensatory education.  (Pl. Mot. Summ. J. at 31.)

Based on the evidence presented at the hearing, Hearing Officer Carroll concluded that

> Parents' contentions with respect to the need
> for a multi-year transition plan, and earlier
> vocational and assistive technology
> assessments are . . . unsupported by evidence
> . . . . The District provided a coordinated
> set of transition activities, beginning with
> the first and only agreed IEP, and added more
> services and activities to the transition
> plan in each successive school year, thereby

30

fulfilling its transition obligations to
Student.

(H.O. Decision at 20.)  Hearing Officer Carroll stated that the
"District was not required to accede to Parents' preference for a
complete, multi-year plan from the beginning rather than a
sequential series of transition plans that together constitute a
multi-year plan."  (Id.)  A review of the record and law
regarding appropriate transition plans supports Hearing Officer
Carroll's decision.


i.   Applicable Law

The IDEA requires that every IEP created for a child
that is age sixteen or older must include appropriate measurable
post-secondary goals based on age appropriate transition
assessments related to training, education, employment, and
independent living skills, as well as corresponding transition
services.  20 U.S.C. § 1414(d)(1)(A)(VIII).  A transition plan is
a "set of activities" based on the student's needs and is created
to help the disabled student move from school to post-school
activities.  20 U.S.C. § 1401(34)(B); 34 C.F.R. § 300.43.  "The
Third Circuit has not defined what amount of transition planning
is required in an IEP to ensure FAPE.  However, the Third Circuit
affirmed one district court's conclusion that a bare transition
plan in a child's IEP did not deny the student FAPE."  High v.
Exeter Twp. Sch. Dist., No. 09-2202, 2010 WL 363832, at *6 (E.D.

Pa. Feb. 1, 2010) (citing <u>Sinan L. v. Sch. Dist. of Phila.</u>, No. 06-1342, 2007 WL 1933021 (E.D. Pa. July 2, 2007), <u>aff'd</u>, No. 07-3258, 2008 WL 4335936 (3d Cir. Sept. 24, 2008)).

To establish that a transition plan is inadequate, a Plaintiff cannot simply argue that an IEP is deficient because it fails to state how a student will meet a transition goal.  <u>High</u>, 2010 WL 363832, at *6.  "[T]here is no requirement for a transition plan to dictate IEP goals.  Unlike the IEP, a transition plan is not a strictly academic plan, but relates to several post-secondary skills, including independent living skills and employment."  <u>Id.</u>  A district is not required to ensure a Student is successful in fulfilling all desired goals. The IDEA is meant to create opportunities for disabled children, not to guarantee a specific result.  <u>Id.</u> (citing <u>Rowley</u>, 458 U.S. at 192; <u>Polk</u>, 853 F.2d at 178).  Furthermore, transition services should be evaluated under the FAPE standard as set forth earlier in this document.

ii.  <u>No Denial of Proper Travel Training</u>

Plaintiffs argue that K.C. was not provided proper transition services because her travel training was not adequately individualized.  Travel training is therapy that enables students with a disability to learn the skills necessary to move effectively and safely from place-to-place within their

32

environment.  (Pl. Mot. Summ. J. at 32.)  Plaintiffs state that
as a result of inadequate travel training, K.C. has not
progressed toward her goal of independence.

The testimony at the due process hearing establishes
that, prior to the 2007-2008 school year, K.C. received
orientation and mobility training via the services of an
orientation and mobility specialist.  (Hearing Trans. at 550.)
On behalf of the District, a Travel Instruction Assessment was
performed by the Delaware County Intermediate Unit ("DCIU").
This assessment was done to determine K.C.'s abilities to travel
independently in the community.  (D-149.)  This assessment
resulted in a recommendation that K.C. participate in a program
called "The Basic Skills Travel Instruction."  This program
would aid in developing K.C.'s skills in the area of orientation,
street crossing, locating rooms in an office building, and
transit.  (Id. at 5.)

K.C.'s Basic Skills Travel Instruction began in January
of 2008. (Hearing Trans. at 346.)  K.C. also received this
training during the 2008-2009 school year, and she was expected
to continue receiving such training in 2010 as part of her IEP.
(Id. at 349.)  This training addressed numerous areas of need
including, but not limited to, safety skills, navigation skills,
gross motor and fine motor skills for proper position of K.C.'s
body, elapsed time, problem solving skills, social skills, and

33

self-advocacy skills in seeking assistance from SEPTA employees.
(D-149.)

Throughout this training K.C. progressed and retained
previously introduced skills thus allowing her to learn
increasingly more complex skills.  In fact, it was recommended
that K.C. participate in another series of basic skills during
the 2008-2009 school year.  (Id. at 16-25.)  For the 2009-2010
school year an increased number of travel training instruction
was offered via K.C.'s September 15, 2009 IEP, as revised on
November 6, 2009.  (Hearing Trans. at 349.)

The record evidences that this instruction was
appropriate and K.C. made meaningful educational progress.
Parents admitted that K.C. made progress in her travel training
instruction.  (Id. at 61, 398.)  Dr. Gazze testified that the
travel training program benefitted K.C. "immensely."  (Id. at
997.)  In particular, Dr. Gazze noted that K.C. is now able to
travel around Philadelphia.  Additionally, Dr. Gazze stated that
based on this training K.C. learned the following life skills:
(1) how to ask for help if she gets lost; (2) how to look at
signs in her environment; and (3) how to cross the street.  (Id.
at 998.)

The basis for Plaintiffs' argument that this training
was inappropriate is a December 2008 report done by a private
educational and rehabilitation consultant, Dr. Domenico Cavaiuolo

("Dr. Cavaiuolo"). Plaintiffs state that Dr. Cavaiuolo's report indicates that K.C.'s transition plan was not tailored to K.C.'s particular needs. (Pl. Mot. Summ. J. at 33.) In particular, Plaintiffs point to the fact that Dr. Cavaiuolo stated that the travel training program needed to be more generalized to allow K.C. to adapt to different environments. (Id.) Parents also point to the fact that Dr. Cavaiuolo's report included ways in which K.C.'s travel training could be improved.

The test as to whether a student's IEP delivers a FAPE is whether it provides a student with the capacity for "meaningful educational benefits." Chambers ex rel. Chambers v. Phila. Bd. Of Educ., 587 F.3d 176, 182 (3d Cir. 2009). An IEP "need not necessarily provide the optimal level of services that parents might desire for the child." Bayonne Bd. of Educ., 602 F.3d at 577. Here, Plaintiffs' arguments miss the point. The record supports Hearing Officer Carroll's decision that transition services related to travel training were provided that resulted in meaningful benefits. Dr. Cavaiuolo stated that he believed the travel training was "valuable and beneficial." (D-118 at 17.) The fact that Dr. Cavaiuolo also indicated that the District could have improved upon the transition plan is irrelevant for purposes of determining whether the transition plan was appropriate.

The only other testimony offered by Plaintiffs to

establish that the travel training failed to provide a meaningful educational benefit is that of K.C.'s father.  K.C.'s father testified that the travel training service was inadequate and K.C. was not benefitting from such service.  (Hearing Trans. at 286.)  Hearing Officer Carroll, however, heard the testimony of both Dr. Gazze—an individual who found the travel training successful—and K.C.'s father and credited the testimony of Dr. Gazze.  Plaintiffs have not pointed to extrinsic nontestimonial evidence to contradict the testimony of Dr. Gazze.  As such, the Court will not disturb the Hearing Officer's determination.

### iii.  K.C. Does Not Still Lack the Skills Necessary to Meet her Transition Goals

Plaintiffs argue that, in general, K.C.'s transition plan was not properly tailored to K.C.'s needs.  Plaintiffs state that this is supported by the recommendations of Dr. Cavaiuolo and K.C.'s failure to meet certain goals.  The record, however, indicates that K.C. has received meaningful educational benefits from her transition plan, and she has been provided abundant transition services.

The IEP team began discussing K.C.'s transition goals and her needs prior to her 2005 evaluation.  K.C.'s 2005 evaluation indicated that "transition services should begin with a functional vocational assessment."  (P-1 at 32.)  K.C.'s May 2007 IEP included a list of transition services identified as

necessary to help K.C. achieve her transition goals of employment and independent living.  (P-23.)  As of January 2008, the functional vocational assessment had not yet occurred thus K.C.'s Parents contacted Dr. Cavaiuolo for a private consultation.[3] Dr. Cavaiuolo reviewed K.C.'s IEPs and the assessments in her educational record, performed interviews with K.C.'s teachers, and concluded that the transition plan K.C. was provided did not address all her transition needs.

Dr. Cavaiuolo identified, as the main problem with K.C.'s plan, that it was too generalized.  (D-118 at 13.)  Dr. Cavaiuolo stated "[i]n general I believe that the overall transition plan contents offer a general direction for a post school outcome for [K.C.].  The main concern I have with [K.C.]'s transition plan and service is that it seems to be generic and perhaps not specific enough to meet her personal and individual needs."  (Id.)  Additionally, Dr. Cavaiuolo provided various recommendations.

Plaintiffs argue that K.C.'s transition plan was not appropriate because it did not include all of Dr. Cavaiuolo's

_____

[3]     One of Plaintiffs' arguments is that K.C. was denied proper transition services because a functional vocational assessment was not performed.  The record indicates that the District attempted to have K.C. complete the SAGE vocational evaluation during the 2008-2009 school year and signed a contract for it to be conducted on February 3, 2009.  (D-123, D-124.) Parents were provided paperwork to consent to the SAGE process on January 29, 2009, but the District did not receive the signed permission to evaluate until August 25, 2009.  (D-144.)

recommendations and, as Dr. Cavaiuolo reported, it was too generalized.  In particular, Plaintiffs argue that better and more services could have been provided.  As previously discussed in reference to K.C.'s travel training, this argument misses the point.  The District is not required to provide all possible services.  The Supreme Court has stated that provision of a FAPE does not require "the furnishing of every special service necessary to maximize each handicapped child's potential." <u>See</u> <u>Rowley</u>, 458 U.S. at 199.  Additionally, an IEP "need not necessarily provide the optimal level of services that parents might desire for the child." <u>Bayonne Bd. of Educ.</u>, 602 F.3d at 577.

The record indicates that although all of Dr. Cavaiuolo's recommendations were not provided, many services were provided via the Pathway School's curriculum.  K.C. was involved in an introduction to careers class that met three times per week.  (Hearing Trans. at 1275.)  During this class, the teacher assisted students in resume writing and job interviewing skills. (<u>Id.</u>)  The Pathway School also offered students opportunities to learn valuable life skills via a transition rotation that rotated four times during the school year.  (<u>Id.</u>)  The teachers in transition rotation teach something that is relevant to life skills experiences, i.e., preparation of meals and healthy snacks.  (<u>Id.</u> at 1275-1276.)  Additionally, through the Pathway

38

School's programming K.C. was able to work with elderly individuals during an activity called the "community services club." (<u>Id.</u> at 1283-1284.) K.C. also participated in a clerical and business class which was specifically developed and implemented using a business model to prepare students for the work force. (<u>Id.</u> at 1287.) For K.C.'s basic independent living skills, K.C. attended a life skills program during the summer of 2008. (<u>Id.</u> at 1327.) The testimony indicates that K.C. benefitted from each of these programs. (<u>Id.</u> at 1275-1287.)

Moreover, the testimony indicates that K.C.'s Parents impeded the District's attempt to provide a more individualized transition plan. For example, the District wanted K.C. to participate in the School to Mall Program; however, K.C.'s Parents rejected this offer because of concerns as to the other children involved.[4] As stated by Dr. Killar and Dr. Gazze, this program would have been extremely beneficial to K.C. (<u>Id.</u> at

---

[4]     This program is a community based work study program, and it was discussed with K.C.'s Parents during the 2007-2008 school year to present. (Hearing Trans. at 383.) This program involves transporting students in vans, along with a job coach, to a department store. While at the store, the students work and are supervised by the job coach and then are provided feedback from the coach. (<u>Id.</u> at 1324.) There are generally only three to four students on a shift. As such, this program allows for ample opportunity for role modeling, practice, coaching, developing routines, task analysis, and teaching skills. (<u>Id.</u>) As a student progresses through the School in the Mall Program, they are moved from Boscov's department store to IKEA—a larger facility. (<u>Id.</u> at 1326.) The School to Mall program is implemented after the student develops social and emotional skills at the Pathway School. (<u>Id.</u> 1393-1394.)

1172-74, 1055-58.)   For other transitional services, the District
recommended the Lehigh Transitions and Assessments Program.   This
program is run by Lehigh University and provides one-on-one
interaction with a teacher that meets with students at their
homes daily and provides the students with community based
instruction in the Lehigh Valley Community.   This too, was not
accepted by Parents.   (<u>Id.</u> at 540.)

        Based on the aforementioned, the evidence clearly
establishes that proper transition services were provided.   Even
though K.C. was not provided every service her Parents or Dr.
Cavaiuolo would have preferred, K.C. was not deprived of any
educational benefits.   Plaintiffs discuss K.C.'s progress and
argue that her failure to achieve transition goals establishes
that her transitional program was insufficient.   Specifically,
Plaintiffs cite to K.C.'s IEP progress report which refers to the
goal of solving "real life practical words problems involving
whole numbers and money." (D-141 at 9.)   This goal requires K.C.
to solve word problems independently with the aid of a calculator
and check her work with 85% accuracy on three separate occasions.
(<u>Id.</u>)   Plaintiffs state that K.C. never fulfilled this goal
because she was unable to solve such problems on a consistent
basis.   (Pl. Mot. Summ. J. at 36.)   The record, however,
demonstrates otherwise.   The IEP indicates that K.C. achieved
this goal consistently except on three out of eight occasions.

(D-141 at 9.)

Plaintiffs also state that "K.C. was unable to identify the number of dollar bills needed to pay for items costing $20 or less on a consistent basis." (Pl.'s Mot. for Summ. J. at 36.) The goal Plaintiffs are referring to is found in K.C.'s 2007 IEP. This goal states that when K.C. is given ten items costing $20 or less, she should be able to count out the appropriate amount of dollar bills needed to pay for the items with 100% accuracy on 5/5 trials. (D-141 at 10.)  The record indicates that K.C. was never able to achieve this goal; however, to determine whether a FAPE is provided does not require the Court to examine whether all transition goals were met.  Rather, the Court must determine whether the service provided meaningful educational benefits. See <u>M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.</u>, 81 F.3d 389, 396 (3d Cir. 1996) (stating that a child is denied FAPE when her IEP fails to confer some, or more than a de minimis, educational benefit); <u>Ridgewood</u>, 172 F.3d at 247 (stating that there is no bright-line standard for determining what level of educational benefit is necessary).  Although, K.C. did not achieve the goal of identifying the number of dollar bills needed to pay for items costing $20 or less with 100% accuracy, the record shows that based on the services provided, K.C. was able to consistently improve in her ability of reaching this goal and attained

41

meaningful educational benefits.[5]

After examining the aforementioned testimony and K.C.'s progress as indicated through curriculum based assessments, observations, and IEP goal progress monitoring, the Court finds that K.C.'s transition plan comports with the <u>Rowley</u> standard. The record establishes that various services have been provided and meaningful progress has been made.  Consequently, the decision of Hearing Officer Carroll will be affirmed as to this issue.

### 2.   <u>Delays Are Not the District's Fault</u>

Plaintiffs' complaint and motion for judgement on the administrative record or, in the alternative, summary judgment, make numerous references to Hearing Officer Carroll's decision that any delays were the fault of K.C.'s Parents.  In particular, Plaintiffs argue that Hearing Officer Carroll reached an erroneous conclusion of fact in finding that any delay in providing services to K.C was attributable to Parents.  (Compl. at ¶ 81(i).)

In her decision, Hearing Officer Carroll refers to the Plaintiffs' closing argument and states that the record supports their argument that there was "'profound delay'" in the provision

---

[5]      In April 2008, K.C.'s progress was at 85% and, by January 2009, she improved this score to 90%.  (D-141 at 10.)

of certain services.  However, Hearing Officer Carroll states

that such delays "arose from parents' unwillingness to move at

all from positions that they adopt[ed]."  (H.O. Decision at 17.)

Hearing Officer Carroll supports this finding with specific

facts.

> The record in this case discloses that
> Student's reevaluation, begun in August 2007,
> required at least 6 IEP team meetings, more
> than a calendar year, and numerous drafts, to
> finalize the R.R.  Moreover, despite Student
> having entered Pathway . . . in the fall of
> 2006, it took nearly the entire school year,
> until May 2007, to finalize the first—and
> only—IEP that Parents accepted.  Despite the
> IDEA requirement that IEPs should be reviewed
> periodically, but at least annually, (20
> U.S.C. § 1414(d)(A)(i); 34 C.F.R. §
> 300.324(b)), the process of reviewing and
> updating Student's May, 2007 IEP, has been
> virtually continuous since that time.  The
> draft IEP offered in November 2009 that
> constitutes the District's final offer of an
> IEP is more than 75 pages long.  Both before
> and after the mediation held in October 2008,
> there were numerous meetings and attempted
> meetings of the IEP team and meetings between
> Parents and one or more District
> representatives.  The amount of time and
> number of meetings to resolve Parents'
> disagreement . . . is excessive. . . .

(H.O. Decision at 18-19.)

Plaintiffs contend that this is an erroneous finding of

fact.  Since this is a finding of fact, the Court recognizes that

it is required to give due weight to Hearing Officer Carroll's

finding.  The Court is to consider the factual finding prima

facie correct and "defer to the [Hearing Officer's] factual

findings unless it can point to contrary nontestimonial extrinsic evidence on the record." S.H. v. State-Operated School Dist. of City of Newark, 336 F.3d 260, 270 (3d Cir. 2003)(alternation and quotation omitted).

Hearing Officer Carroll's decision is well-supported. The record is replete with parental obstruction and delay which began upon K.C.'s enrollment in the Pathway School. K.C.'s father testified that it took numerous meetings to develop K.C.'s IEP dated December 21, 2005. (Hearing Trans. at 78-79.) Development of the IEP for K.C.'s 2006-2007 school year began in September 2006, and it was not approved by K.C.'s Parents until May 2007. (H.O. FF at ¶ 7.) Parents repeatedly requested changes to the IEP, and the IEP was revised six times between October 2006 and May 2007 at K.C.'s Parents' request. (Hearing Trans. 108, 542, 641, 1348-1349, D-11, D-13, D-21, D-23, D-25.) In developing K.C.'s IEP for the 2007-2008 school year, Parents objected to having K.C.'s special education teacher as a member of the IEP team. (Hearing Trans. at 647-48.) Additionally, after rejecting the proposed IEP dated October 1, 2007, Parents requested numerous revisions to the proposed IEP and requested additional IEP meetings. (D-52, D-55, D-56.) In January 2008, Parents concluded that the current IEP process was flawed and needed to be restarted. (D-63.)

Moreover, K.C.'s tri-annual re-evaluation report was

44

commenced in August 2007, but it was not completed until April 2008. During this time, the re-evaluation report was revised at least six times at the request of the Parents. (Hearing Trans. 923-924, 1220-1227, P-91.) Parents prepared their own version of the re-evaluation report and debated the appropriateness of the DSM-IV diagnostic with a certified school psychologist. (Hearing Trans. 374, 1228-1232, 924, 1120.) The documentary evidence establishes that Parents requested numerous revisions because they wanted their exact wording in the documents. Parents went so far as creating their own Permission to Evaluate, a Re-evaluation Report, and IEPs, which they provided to the District. (D-47, D-119.) The administrative record contains numerous other instances of delay caused by the Parents.

Plaintiffs do not point to one piece of nontestimonial evidence that contradicts this testimony. Consequently, the Court will affirm the Hearing Officer's finding that delays were caused by K.C.'s Parents.

a.   <u>Delay of PT and OT is Due to the District</u>

In addition to challenging Hearing Officer Carroll's general finding relating to delay, Plaintiffs contend that, in particular, delay in providing PT and SOT services are attributable to the District. (Pl. Mot. Summ. J. at 28.) Plaintiffs state that Hearing Officer Carroll's finding to the

contrary is in contradiction to the documentary and testimonial evidence.  Plaintiffs state that Hearing Officer Carroll's decision implies that it was K.C.'s Parents' obligation to agree to the 2007 evaluation report despite their disagreement with the report.

In September 2007, the District agreed to provide an independent evaluation for both PT and SOT services.  (D-47, D-51.)  In order to initiate an evaluation, the District must issue a Permission to Evaluate ("PTE") form.  On October 1, 2007, the District sent Parents a PTE form that requested permission for Travel Training, PT, and SOT.  (D-43.)  Instead of consenting, Parents crossed out permission as to all evaluations except for Travel Training.  (D-43.)  Thereafter, on October 12, 2007, Parents drafted their own permission to evaluate which included an independent sensory integration OT and PT evaluation.  (D-47.)  Because the law places the responsibility of obtaining the Parents' permission on the District,[6] rather than accepting the Parents' homemade PTE, the District issued another PTE on October 31, 2007.  This was not returned to the District until November 26, 2007.  (D-51.)

Via mediation, the parties agreed to have Cindy Miles & Associates conduct K.C.'s re-evaluation.  (P-45.)  This re-

---

[6]     The obligation of obtaining permission to evaluate is placed squarely with the school, not the parent.  See 22 Pa. Code 14.123(c), 22 Pa. Code 15.5(c), 22 Pa. Code 15.6(f).

evaluation was not completed until January 2008.  (P-45.)
However, the evaluation performed by Cindy Miles & Associates was
unacceptable to the District because it was based on a medical
model rather than an educational model.  As such, the District
informed Parents that the report needed to be reviewed by the
Intermediate Unit.  In order for the Intermediate Unit to review
the report, a new PTE had to be signed by K.C.'s Parents.  On May
15, 2008, Parents were provided a PTE.  (D-85.)  Parents signed
the PTE, but they did not sign the release to permit the District
to provide the PT evaluation to the Intermediate Unit.  It was
not until the October 2008 mediation that Parents agreed to sign
the release.  Following this mediation, the District sent the
release and it was signed on October 25, 2008.  (P-103, P-106.)

    The record supports Hearing Officer Carroll's finding
that delays in relation to evaluating K.C. for PT and SOT
services were due to the Parents' actions.  Plaintiffs have not
pointed to evidence that leads the Court to second guess the
judgment of Hearing Officer Carroll.  As such, Hearing Officer
Carroll's determination will be affirmed.

### 3.  Zealous Advocacy

    Plaintiffs argue that Hearing Officer Carroll
erroneously denied their request for compensatory education
"based upon what she perceived as the Parent's overzealous

advocacy." (Pl. Mot. Summ. J. at 36 (citing H.O. Decision at
17); Oral Arg. Trans. at 13:14-23.) At oral argument, Plaintiffs
argued that Hearing Officer Carroll based her entire decision on
K.C.'s Parents' unwavering advocacy. (Oral Arg. Trans. at 13-
14.) Plaintiffs argue that the Hearing Officer's decision
"seem[s] to suggest [K.C.'s Parents] were required to agree with
[IEPs] in part or agree with [IEPs] and see what happened,
although [Parents'] position was that [the IEPs were]
inappropriate." (Oral Arg. Trans. at 14:4-8.) Plaintiffs'
argument is a misstatement of Hearing Officer Carroll's decision,
and the District's arguments.

Neither the District nor the Hearing Officer concluded
that Plaintiffs should be denied compensatory education
exclusively because of the actions of K.C.'s Parents.
Additionally, neither the District nor the Hearing Officer
renounced or even questioned the District's obligation to provide
a FAPE. Hearing Officer Carroll's denial of an award of
compensatory education is based primarily on the fact that she
found that the special education and related services provided to
K.C. constituted a FAPE that resulted in the delivery of
meaningful educational benefits. (See supra Section (IV)(1);
H.O. Decision at 19-21.)

Plaintiffs are correct in noting that Hearing Officer
Carroll cited to K.C.'s Parents' conduct; however, these

48

references were done to support Hearing Officer Carroll's

ultimate conclusion that it was K.C.'s Parents' actions which

resulted in "profound delays" and not the District's actions.  In

discussing the delays at issue, Hearing Officer Carroll stated

that they must be "considered in light of [Plaintiffs']

insistence that evaluators, evaluations, and IEPs meet with their

approval in every aspect."  (H.O. Decision at 17.)  Thus, Hearing

Officer Carroll considered all of Plaintiffs' claims relating to

delays in light of the fact that Parents were unwilling to

compromise at various points throughout the process of developing

IEPs.  Hearing Officer Carroll cannot be faulted for taking into

consideration the cooperation of the parties because, as she

stated, "although Parents are members of the IEP team and

entitled to full participation in the IEP process, they do not

have the right to control it."  (H.O. Decision at 16 (citing

Kasenia R. ex rel. M.R. v. Brookline Sch. Dist., 588 F. Supp. 2d

175 (D.N.H. 2008)))[7]; see also 20 U.S.C. 1414(d)(1)(B), (d)(4)

---

[7]     In Kasenia, the court held that the unreasonable
conduct done by the student's parents relieved the school
district of its responsibility for delays and other procedural
violations.  The Kasenia court analyzed various procedural flaws
cited by the student's parents, including their claim that the
district did not conduct the student's educational evaluation in
good faith thus resulting in delays that contributed to the
denial of a FAPE.  588 F. Supp. 2d at 188-89.  The court held
that any delays in the development of the student's IEP were
"substantially attributable to [the students' parents'] conduct,
[and] this alleged procedural flaw did not violate the IDEA."
Id. at 190.  The Kasenia court explained that the delays were due
to the student's parents because they withheld their cooperation

(designating the development of IEPs as a "team" process).

Moreover, even if the delays at issue were found to be the fault of the District, such a fact would not change the outcome of the decision.  The ultimate question is whether these delays resulted in the denial of a FAPE.  Delays are procedural violations of the IDEA and "'[a] procedural violation of the IDEA is not a per se denial of a FAPE; rather, a school district's failure to comply with the procedural requirements of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents.'"  <u>C.H. v. Cape Henlopen School Dist.</u>,  606 F.3d 59, 66 (3d Cir. 2010) (quoting <u>Knable ex rel. Knable v. Bexley City Sch. Dist.</u>, 238 F.3d 755, 765 (6th Cir. 2001)).

The IDEA's implementing regulations indicate that "substantive harm occurs only if the preponderance of the evidence indicates that 'the procedural inadequacies (i)[i]mpeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of the educational benefit.'"  <u>Id.</u> at 67 (quoting 34 C.F.R. § 300.513(a)(2)); <u>see also</u> <u>Bayonne Bd.</u>

_____

in developing student's IEP by objecting to all of the evaluations proposed by the District, breached a settlement agreement permitting the District to have student evaluated by its own evaluators, and insisted on unreasonable conditions.  <u>Id.</u>

of Educ., 602 F.3d at 565 ("[T]hough it is important that a school district comply with the IDEA's procedural requirements, rather than being a goal in itself, such compliance primarily is significant because of the requirements' impact on students' and parents' substantive rights."); Souderton Area Sch. Dist. v. J.H., No. 08-2477, 2009 WL 349733, at *6 (E.D. Pa. Feb. 11, 2009) ("Procedural errors do not violate the right to a FAPE unless they result in 'the loss of educational opportunity, seriously infringe upon the parents' opportunity to participate in the IEP formulation process, or cause a deprivation of educational benefits.") (citations omitted).

Here, Parents do not argue that the delays resulted in them not being able to meaningfully participate in the process of providing K.C. a FAPE. In fact, the record indicates that K.C.'s Parents were greatly involved in K.C.'s re-evaluations, the development of IEPs, mediation with the District, and numerous other meetings "to resolve Parents' disagreement with, primarily, activities of daily living, transition, and related services." (H.O. Decision at 18.) Moreover, as discussed above, the delays did not result in the denial of K.C.'s receipt of a FAPE. (See supra Section (IV)(1).) Consequently, the Court finds that Hearing Officer Carroll did not abuse her discretion and Plaintiffs' motion for judgment on the administrative record or, in the alternative, summary judgment, will be denied as to this

issue.


    4.   <u>Attorneys' Fees</u>

Plaintiffs request attorneys' fees under the IDEA. Pursuant to the IDEA, the court, "in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B).  To qualify as a prevailing party, a plaintiff must "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."  <u>John T. ex rel. Paul T. v. Del. County Intermediate Unit</u>, 318 F.3d 545, 555 (3d Cir. 2003) (quotation omitted).  The "touchstone" of the inquiry is "the material alteration of the legal relationship of the parties."  <u>Id.</u> (quotation omitted).

Because Plaintiffs have not succeeded on the merits, Plaintiffs are not a "prevailing party" and are not entitled to attorneys' fees.


    B.   <u>Defendant's Motion for Judgment on the Administrative Record</u>

The Court will now proceed to consider the merits of Defendants' cross-motion for judgment on the administrative record or, in the alterative, summary judgment.


    1.   <u>Extraneous Arguments</u>

Many of the Defendant's arguments were addressed in the above analysis of Plaintiffs' motion for judgment on the administrative record or, in the alternative, summary judgment. Defendant, however, has raised a few arguments that stem from Plaintiffs' complaint but were not addressed in Plaintiffs' motion for judgment on the administrative record or, in the alternative, for summary judgment. The Court will now address the following four arguments asserted by the Defendant: (1) the hearing officer did not commit an error of law by obligating Parents, during the pendency of due process, to partial agreement with a proposed IEP; (2) Plaintiffs' claims for compensatory education for the 2006-2007 school year are time barred; (3) the District is not legally obligated to act as the Student's Local Educational Agency ("LEA") beyond age 21; and (4) the District's proposed IEP of November 2009 constituted a FAPE.

      a.    The Hearing Officer Did not Commit an Error of Law

Plaintiffs' complaint alleges that Hearing Officer Carroll committed an error of law by obligating Parents, during the pendency of the due process hearing, to "partial agreement" with a proposed IEP that included inappropriate programming or risk forfeiting the right to compensatory education. (Id. at ¶ 81(v).) These allegations are not specifically discussed in Plaintiffs' motion nor are they discussed in Plaintiffs' response

53

to Defendant's motion.  Moreover, such allegations are inaccurate and wholly unsupported by Hearing Officer Carroll's decision.  As such, the Court finds that Hearing Officer Carroll did not obligate Parents, during the pendency of the due process hearing, to agree with IEPS they believed were inappropriate.

b.    Any Claim for Compensatory Education for the 2006-2007 School Year is Time Barred

In Plaintiffs' response to Defendant's cross-motion, Plaintiffs indicate that they are not seeking compensatory education for the 2006-2007 school year.  (Pl. Resp. at 24.) Plaintiffs state that their claim for compensatory education is based on a denial of services from September 2007 onwards.  (Id.) Consequently, the Court finds that Plaintiffs are not entitled to compensatory education for the 2006-2007 school year.

c.    The District is Not Legally Obligated to act as Student's LEA Beyond Age 21

In Plaintiffs' response to Defendant's cross-motion, Plaintiffs indicate that the complaint does not seek to extend the District's obligations as an LEA.  (Pl. Resp. at 24.)   As such, the Court will not determine whether the District is legally obligated to act as K.C.'s LEA beyond age 21.

d.    The District's Proposed IEP of November 2009 Constituted a FAPE

Plaintiffs' complaint alleges that the hearing officer abused her discretion in finding that the Parents were obligated to accept the November 2009 IEP.  (Compl. at ¶ 81(x).)   These allegations were not discussed in Plaintiffs' motion for judgment on the administrative record nor were they discussed in Plaintiffs' response to Defendant's motion for judgment on the administrative record.  Hearing Officer Carroll found that the November 2009 IEP provides a FAPE.  (D-148; D-166.)  This decision was based largely on the fact that Parents' expert, Dr. Gazze, testified that she agreed that virtually all of the proposed specially designed instructions comported with her recommendations and were appropriate.  (Hearing Trans. 1041-1042, 1053-1061, 1180-1186.)  Plaintiffs have not provided any evidence to compel a contrary finding.  Consequently, the Court finds that K.C.'s 2009 IEP constitutes a FAPE.

2.   <u>Defendant is Entitled to Judgment as to Counts I,
     II, III, and IV</u>

For the reasons set forth in section IV. A. of this memorandum denying Plaintiffs' motion for judgment on the administrative record, or in the alternative, for summary judgment, the Court finds that Defendant is entitled to summary judgment as to count I of Plaintiffs' complaint.

In count II of the complaint, Plaintiffs bring a claim under the Rehabilitation Act, 29 U.S.C. § 794 ("§ 504").   In

55

count III of the complaint, Plaintiffs bring a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101. Defendant asks that judgment be granted in its favor as to both these counts as well.  Plaintiffs do not dispute this request in their motion for judgement on the administrative record nor in their response to Defendant's motion for judgement on the administrative record.

Based on a Court approved stipulation, the parties have agreed that the § 504 claim shall remain but with no rights of review or remedy broader than the IDEA claim.  Thus, the applicable standard of review is the same as that which applies to the IDEA claims.  Section 504 prohibits discrimination on the basis of disability in federally funded programs.  To establish a violation of Section 504, "a plaintiff must prove that (1) [s]he is 'disabled' as defined by the Act; (2) [s]he is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) [s]he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." Ridgewood, 172 F.3d at 253 (quoting W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995)).

In the complaint, Plaintiffs allege that the District violated § 504 by "intentionally and knowingly failing to provide [K.C.] with appropriate services and an appropriate program which

56

[would] allow [K.C.] to reach her transition goals of independent living" and "[p]roposing to provide [K.C.] with an educational program that [is] not equal to those afforded to others." (Compl. ¶¶ 82-83.)   These claims are based on the same facts underlying the IDEA claim.   Given that none of the § 504 claims are outside the ambit of the IDEA, and the Court has already concluded that the District did not deny K.C. a FAPE, Plaintiffs' § 504 claim also fails.   Moreover, Plaintiffs have not briefed this issue and there is no evidence of record to indicate the District intentionally and knowingly denied K.C. proper services or discriminated against K.C.

In regards to the ADA claim, Plaintiffs' complaint simply reiterates the allegations for a violation of the IDEA. As such, Plaintiffs' ADA claims are subsumed by count I—violation of the IDEA—and Plaintiffs are not entitled to relief under the ADA for the same reasons they are not entitled to relief under the IDEA.   Like the § 504 claim, Plaintiffs have not briefed this issue in their motion for judgment on the administrative record nor their response to Defendant's motion for judgment on the administrative record.   Moreover, the stipulation of December 22, 2010 indicates that Plaintiffs have agreed that they will not seek any damages remedies or rights not available under the IDEA. Consequently, Defendant's cross-motion for summary judgement will be granted as to counts II and III.

Because the Court has found that Plaintiffs have failed to succeed on the merits as to any of its claims, Plaintiffs are not a "prevailing party" and are not entitled to attorneys' fees. Consequently, Defendant's cross-motion for summary judgment will be granted as to count IV.

## V.   CONCLUSION

For the reasons set forth above, Plaintiffs' motion for judgment on the administrative record or, in the alternative, summary judgment will be denied.  Defendant's cross-motion for judgment on the administrative record or, in the alternative, summary judgment will be granted as to all counts.  The decision of Hearing Officer Carroll will be affirmed.  An appropriate order will follow.